Final case this morning is United States v. Sanchez, No. 22-6207. Mr. Sanderford. Yes, good morning. I'm Dean Sanderford from the Federal Defender's Office, and I'm here for Octavio Sanchez. When a Trump court receives credible evidence that a jury has been exposed to an external influence, it has a duty to get to the bottom of it. But here, when the court learned that the jury's deliberations were video recorded, it refused to even ask the jurors whether they were aware of the camera or knew it was recording. This was an abuse of discretion. The Sixth Amendment guarantees a jury securing the belief that its deliberations are private, with no one looking over their shoulders. The presence of a camera clearly threatens this right because it could lead the jurors to believe that they're being watched by government officials. There were at least genuine concerns that the presence of the camera could have influenced the jury's deliberations, and under this court's precedent, the existence of those concerns required the district court to, at minimum, take the modest step of asking the questions that defense counsel proposed. Okay, Mr. Sanderford, I would say the problem that I have is based on what you just said. If the error was failing to answer the questions, the questions didn't include whether or not the jurors thought they were being recorded. So if the judge had answered the jury's questions, the defendant still wouldn't know the answer to the question that you're posing to us. Well, I think the questions do fairly capture that, because the questions were, were you aware there was a camera, did you think it was on, and did you discuss it, and how extensively did you discuss it? So all of those questions go to whether or not the jury was concerned about the presence of the camera, and the only reason to be concerned about the presence of the camera is if you think there might be someone watching. So yes, that question wasn't directly asked in those terms, but I think the questions all fairly, would have given that same kind of information, would have gotten that same sort of information from the jurors. So I have a question about getting help from other cases, and you cite a number of cases, but the one thing that makes them seem a little different from this situation, the Green case, the Stouffer case, the Remmer case, is that there the issue was whether someone was trying to influence the jury in favor of one side or the other, and I'm not sure just the mere presence of the camera gets you quite that far. Can you, first of all, is that a meaningful distinction, but second, is there, whether it's in circuit, out of circuit, do we have guidance on something that's a little closer to what happened here? Sure. Well, first, I couldn't find any cases where a jury was video recorded, so I can't give you a case exactly like that. Except the one, except Nichols. Well, Nichols, sure, which happened in Oklahoma, the same sort of thing, and I can address Nichols, and want to address Nichols, but we do cite a case from the Ninth Circuit where the allegation was that there were IRS agents glaring at the jurors from the audience. I understand that that's not quite the same thing as a camera, but it's not a direct communication or a contact the way you had in B.J. Stouffer's case. But if you look at the just general principle, it's that jurors can't be exposed to external influences, and what the Supreme Court says in Remmer, that includes situations where the juror feels like there's people looking over their shoulders, and that's precisely the situation you have with a camera that's recording them. So it is certainly an external influence in the sense that it's something that's not part of the trial, not part of the evidence, that could have influenced the jury's deliberations because they feel like they're being watched. And we know that this is the reason why jury deliberations are supposed to be kept private, is that to publicize them runs the risk of a chilling effect, of stifling their debate in the jury room. So I don't think that there is a conceptual or meaningful difference between this case and the more usual case you have, which is when there's a contact with a juror from someone outside, like the bailiff in Parker v. Gladden or the bribery thing in Remmer. I think it's the same sort of problem that fits under the same rubric. Could you talk about Nichols? I noticed you didn't file a 28-J. I understand it's an unpublished case, but does that help you or hurt you? I don't think it does either, really. I mean, Nichols, the claim was different. It was just, we get a new trial simply because there was a camera in the jury room. And what this court said was that we don't know whether the jurors were aware of the cameras, so there's no basis to vote for it. So why doesn't that help you? Well, maybe it does help me. But I think the point is that they jumped ahead. They made the mistake of not trying to develop the record first. And that's precisely what defense counsel was trying to do in this case, was say, look, we're not moving for a new trial now. We need to ask the jurors whether they were aware. Because if the jurors all come back and say, we had no idea there was a camera in the room, then there would be no problem. But if the jurors come back and answer these questions in a different way and say, yeah, we were aware of the camera. We talked about the camera. We were concerned about the camera. Well, you couldn't get that far, could you, though? I mean, there's a line you've got to draw because you can't ask the jurors about anything that influenced their deliberations, right? That's true, but— So, I mean, even if you could get from them, okay, well, yes, we saw the camera. Yes, we assumed it was recording. Yes, we assumed it was being monitored. Yes, we assumed it was video, not audio. You might get all of that, but would you still know how it—whether it did or did not—was it talked about? Did it impact? You can't ask, did it influence you? No, you can't do that, but you can go just a step farther from the questions that you just summarized. The Vigil case from this court says you can also ask the jurors whether they discussed it and the extent to which they discussed it. That doesn't violate the rule because it doesn't go into the mental processes concerning the verdict. You're not asking the jurors whether the camera affected their vote. It's an objective indication of did it matter to them or not. So, I think that's an important piece of this because if what we were able to get from the jurors was we were aware of the camera, we were worried that it was on, and we discussed it, it came up a lot. Those would all be permissible under the rule. What if you just got, we were aware it was on, we didn't discuss it, what would you do with that? Well, I think that would be a harder case, and if that's the way—if you were to remand and that's the way it came out in the district court, then maybe there would be an outcome battle in terms of proving harm. But we're really not at that stage yet. We don't know what the answers are because the judge refused to ask them. Or what if you got 11 people said, I didn't know there was a camera, and one person said, I was aware there was a camera. I think even one juror with concerns would be a problem because— Well, aware is a concern. Again, you'd have to have a— Is this a harmless error situation? Well, no, it's not because as this court said in Stauffer, you only address harmless error after you've asked the jurors the questions ascertained to the degree or possibility of prejudice. It's too early to do it at this stage, essentially. So that would be for the district court to do on remand after getting to the bottom of it, talking to the jurors, asking the questions that are allowed. Does the statute, 18 U.S.C. section 1508, give you any traction here? I'm not sure I'm aware of that statute. The statute says that you're not supposed to record, listen to, or observe jury deliberations. Right. That sounds like a helpful statute. But I mean, the Sixth Amendment in court cases all say that jury deliberations have to be private, so that's helpful. I don't think it's necessary, but it sounds like a good statute. Well, we mentioned it in Nichols. It basically suggested that if the government wishes to reassure future jurors, despite the lack of any known effect on this jury, it has the means to do so beside the statute. I see. Okay. I'm not sure what that is. I'd like to also just briefly address, and this is jumping ahead a bit, so if there's more questions, please just let me know, this idea that there should be a presumption of prejudice if you do remand. That's the usual rule in these cases, is that when a jury is exposed to an external influence, there's a presumption of prejudice. That sounds like kind of a radical doctrine, but it's not. All it really means is that the government has the burden of proving harmlessness beyond a reasonable doubt, which is the normal burden that the government has whenever there's a preserved constitutional error on appeal. But do you need a presumption for your argument? I mean, it seems in these circumstances it's a little premature until they get the questions. It is, and the only reason that I bring it up is because we briefed it, and because I do think it would be helpful if you think the presumption applies to tell the district courts that the proceedings on remand, if you do remand, go the way they should go. There's already been a reversal in this circuit because the district court didn't apply the presumption of prejudice, and I think it would probably be helpful if you do remand to just let the district court know what the standard on prejudice is. Wait, and you're referring to when you say there's already been a case on presumption of prejudice? What are you referring to? I'm referring to the Davis case that was cited in the briefs, and this court remanded to the district court because the district court failed to apply the presumption of prejudice when it was analyzing whether or not the effect on the jury required a new trial. So it's not something you need to decide in this case. It's your right, 100% right, and it's premature, but I do think it would be helpful guidance if you are going to rule in our favor on this case. That's what I'm getting at. Mr. Fennifer, can I ask you a question? Why would it be unreasonable or an abuse of discretion for Judge Goodwin to say that even if he draws inferences favorably to the defendant that the jurors knew that they were being recorded? There's no question about that was posed, I don't think. Do you think that the camera was also taking down the words? So if he had answered the questions that had been posed, the only thing that would be different would be that the jurors knew that when they were situated at counsel table, in the middle of this big courtroom, that their movements were being recorded. And why would it be unreasonable to say even if that's true that would be immaterial without knowing what was said? You know, hypothetically, let's say the panel here conferences about this case by Zoom after we're through and Mr. Duran forgets to turn off the recording and the world sees how I move when I'm talking to my colleagues about how to decide. Well, unless you know what I'm saying, who cares about my movements? So why would anybody at your care, or at least why would it be unreasonable for a judge to say, yeah, it would be immaterial if you could see your movements without knowing what was said? Well, a couple of things on that. One, the questions that we wanted to ask the judge were, were you aware of your camera being taken down? There was no question about audio in particular, but it's not speculative to think that the jury might have thought that their words were being recorded as well. They thought that they were being watched. So I'm not sure without talking to the jurors that it would be proper to just kind of assume that they all knew that there was no audio. Even though we know that there was no audio, we don't know what they knew. The only reason we know that is because we talked to the marshals. And second, I don't think it would be appropriate for the judge to jump ahead to this question of prejudice before talking to the jurors and really getting to the bottom of it. And that's really what this court said in Jay Stalker's case, was this kind of harmless error, you don't get into that until you talk to the jurors. Am I maybe getting my case mixed up here? But I was thinking that in the case, in the Nichols case, it was actually monitored, the camera was monitored, and there was some evidence that the CSO knew what the jurors had done because he watched them raise their hands and vote. Isn't that your best example right there of what can happen, what someone can see from a video, and then he told people about it? Yes, that's right. What the vote was. That is a good point. Even without hearing what the jurors had said, the allegation anyway was that the CSO knew the count of the first vote, presumably because they voted by some sort of gesture. So let me ask you about something you have in your brief. On page 12, you make the point that security cameras like the ones used in courtrooms are ubiquitous. Nearly all banks, gas stations, retail establishments use them, home security systems. If they become so ubiquitous, doesn't that sort of dilute your chilling or stifling argument? I don't think it does because I think even if we're kind of all used to being video reported in public, a camera in a deliberation room is different. I think that we're used to being seen in a gas station, but if a juror looks out, deliberations are supposed to be private, no one is supposed to be watching and sees a camera. It can have an effect, even if in our everyday lives we're used to being surveilled that way. I see I'm out of time? You got it right on the money. All right. Thank you, counsel. May I please report? My name is Mary Wolters, and I represent the United States of America in this case. The sole issue before the court today is did the district court abuse its discretion by not allowing the questioning of jurors by Mr. Sanchez? The standard of review in this case is abuse of discretion, and it is a broad discretion invested in the district courts. Well, counsel, it seems to me that the argument, the government's argument, comes across a little bit like the Catch-22 problem, because you say there's no evidence that the jurors were aware of the camera, but you also say that Mr. Sanchez can't take simple steps to find out if they were aware of the camera. So where does that leave us? Your Honor, we disagree with the statements in counsel's brief for Mr. Sanchez that there was no investigation into this alleged outside influence. There was extensive investigation into this alleged outside influence by the district court in a series of motions, joint motions with nine questions posed to the United States Marshal Service to be answered and for counsel for both sides to do with that information what they felt was appropriate. So there was an extensive investigation into this alleged outside influence, and with that information, the court then had all of the information that it could glean from appropriate questioning. And to this panel's point in the questions posed to counsel, that third question that was requested to be asked by the jurors in the final motion by Mr. Sanchez of whether or not did the jurors mention or discuss the presence of any camera starts to get into discussions about how cameras, if they were even noticed in the first place, would influence the deliberations. And in fact, in counsel's, Mr. Sanchez's opening brief, says that the need to question jurors because without questioning them, it is impossible to know whether the cameras have influenced their deliberations is directly contrary to Rule 606B, which forbids district courts from asking jurors. That's a long answer to what I think was a little bit more of a simple question, and that is, do we know now whether the jurors were aware that there were cameras, period? Not whether they discussed it, not whether it influenced, just that they knew they were there. Do we know that? We do not, Your Honor. And what's wrong with just asking them if they knew they were there? It's a pretty simple question. And Your Honor, to the point of whether they were there, whether or not that rises to the level of an alleged outside influence that needs to be further addressed, and ceding to this panel's question to counsel, the ubiquitous nature of these cameras lends itself to the fact that it would not have a chilling effect. And in fact, a chilling effect on the deliberations, and in fact, even though Mr. Sanchez did not ask the district court for an analysis as to the effect of what that alleged intrusion would be. Is it fair to say that what you're telling me is that it doesn't matter whether they knew they were there? Is that your position? It doesn't matter in the fact that it does not rise to a level where further investigation was needed at that point, based on the information that the district court had, based on its extensive investigation, yes, Your Honor. Did I have the facts right in Nichols about the CSO that was aware of the vote, first vote? You did, Your Honor. Doesn't that concern the government? Doesn't that concern the government? You got a CSO monitoring a jury that may or may not know whether they're being monitored, who proceeds to let people know what the first vote was, can see from apparently, I presume a hand raised, guilty, not guilty. Isn't that exactly the problem we've got here? And what if this jury thought not only that they were being watched and perhaps they could see that type of vote, but there was audio, just as there is in this courtroom right now, that there was audio in the courtroom. How does this jury know whether that camera was surveillance only in the courtroom, was video only, whether it was being watched? What did they speculate? We don't know. We don't know anything because the judge refused to ask the jury. And we said in Nichols, we're not going to give you a mistrial because you didn't develop a record. Here, we're trying to develop a record about this, and we can't get anywhere. So, I mean, it is a Catch-22. What would the government propose be done here as far as finding out that important question of whether the jurors themselves were aware of this camera? Yes, to your question, Your Honor, there is obviously concern when there is an alleged intrusion into jury deliberations. In the sphere of the global pandemic that we were in at the time, the spacing of jurors was concerning to the court to use video. I get why they did it. Apparently, nobody thought about the cameras, but we're now here dealing with that, and cameras don't belong in the courtroom or in a jury deliberation room, period. End of story. What are we going to do about it when you're trying to develop the record? We're not asking for a mistrial now, like in Nichols. We're trying to develop the record. Yes, Your Honor. How do they do that? How do they do that without asking the jurors if they were even aware of it? And the district court did develop the record in this case, Your Honor. Without that important information. And to that point, Your Honor, the alleged outside influence in this case, while the court could have done a better job of explaining that there was no evidence of actual prejudice, the implicit conclusion was sufficient. And I understand the court's concern. Obviously, cameras in the courtroom is a concern. Excuse me, cameras in the jury deliberation room is a concern. However, the district court did not abuse its discretion in this case in that it did, in broad use of discretion, investigated to a point where there was information that was able to determine whether or not there was an influence that needed further investigation. And to the point of not asking for a mistrial in this case, Your Honor, even if this court were to remand for an evidentiary hearing at this point, because the defendant has missed the window to raise that issue, there would be no remedy at the time of a remand in this case, making that moot because of the Rule 33 time limits that have been put. How can the government defend that position? In other words, Mr. Sandiford is saying you couldn't moot for a mistrial at that juncture because the defense counsel didn't have the answers to these questions. How do you get the answers to the questions? Judge Goodwin said, no, I'm not going to elicit these answers to these questions. So the defendant is handicapped, not able to moot for a mistrial, not able to moot for a new trial. And now the government says, well, you didn't moot for a new trial. Well, if he had mooted for a mistrial, for a new trial, it would have violated Rule 11. I mean, he would have had no basis for it. So he's saying, well, he'd have no remedy. I think it's the posture of where the case stands now that is where we sit, Your Honor. And I do understand your question in that the evidence of whether or not the jurors knew of these ubiquitous cameras that are akin to, as stated in United States v. Dempsey, that would be the case where there was an interpreter for a deaf juror in the jury deliberation room. That at this point, with the investigation that was completed, no further investigation was required because that evidence was already in the record to determine that there was not an outside influence that would have warranted further investigation. Is this just another way of saying harmless error? That if we said that the district court abused its discretion, are you saying it wouldn't make any difference anyway? It's too late. Well, I'm just stating the fact that Rule 33 has… Well, no, I'm asking, is this a harmless error argument? Any error that happened in this case would be harmless in looking at United States v. Davis, that the show or existence of overwhelming evidence of the defendant's guilt can overcome… Well, but that wasn't what you were saying earlier. It was more of a timing argument, not an overwhelming evidence argument. And I think we have both in this case, Your Honor. If we look at the evidence that was presented at the jury trial, we have Mr. Sanchez alone in a residence where he lives at the time the search warrant was executed, a firearm in the company magazine located in the kitchen area. He admitted, Mr. Sanchez, that he was the only adult male living in the residence where a 9mm round was found in a backpack. All right. I think I understand where you're going. But how do you respond to counsel's argument that this isn't the right time to be raising this, that if you're going to get to harmless error, you have to hold off and get this information in hand first about… How do you know if it's material? Yeah. How do you even know when you don't know what the facts are? How can you balance it against the evidence? Your Honor, I understand counsel's argument of wanting this information. Well, no, it's more than an argument. He cited a case, Stouffer. So do you think that's a proper use of Stouffer by Mr. Sanderford? Yes, Your Honor. I see that the counsel for Mr. Sanchez relies heavily on Stouffer, but we also have to look at Stouffer in the progeny of Simpson and Davis. And as stated in United States v. Cooper, this court rejected the argument that under Stouffer, the district court abuses discretion in declining to hold a hearing because Stouffer did not overrule Davis. In United States v. Davis and United States v. Simpson, the court determined that any additional hearing would be simply redundant and that the court had the information necessary to make the decision not to have an additional hearing because it had the evidence that the alleged outside influence was not one that needed further investigation. That's the difference, isn't it? We don't have that. It didn't have all the information. But, Your Honor, there was an investigation and it does have information based on the nine questions posed to United States. Which, if we decide that that didn't really tell us what we need to know, are we back to that same position of we don't have the information that we need here as compared to Davis? We have some. We just don't have anything about the jury. Your Honor, I think this goes back to the ubiquitous nature of cameras and the fact that we had jurors coming into federal courthouses where there is an obligation for safety and an obligation to keep them safe. The cameras in a courtroom are for that purpose. There's nothing in the record to show what they knew was the problem. We don't know what they knew about those cameras or what federal judges or courthouses normally would have present in the courtroom. Yes, Your Honor. One aspect of your argument I wanted to come back to. I thought it was an interesting point. You said that there were three questions that were proposed, right? And just to summarize, number one, were they aware of the camera? Whether they knew it was on and whether they discussed it? And I think you made an argument a few minutes ago that the third question is problematic. You think that that would be going a little too far in asking about deliberations. Is that what you were saying? Yes, Your Honor. All right. But what about the first two questions? Because that wouldn't be a problem with those, correct? It would not pose the same problem that question three poses. We still would argue that the district court did not abuse its discretion in not allowing for a hearing at all. But the fact that— Could we split it and say abuse of discretion on one and two, but maybe not on number three until we know what happens on one and two? I think it's fair to say, Your Honor, that there was not an abuse of discretion to further hold a hearing. But in seeing the district court—and the district court requested a response— or, excuse me, a reply from the defendant where these questions were posed, again, to further its investigation. And in seeing the questions as a whole, the district court did deny the hearing, again, based on the fact that it had all of the information that needed in line with the facts and progeny from Stouffer, which is the Simpson— Did the court ever say, you know, I don't know about that question three? Did the court ever single that out the way you have this morning?  Outside of the order issued by the court, I'm not privy to the decision-making that went into making that order. Would it be problematic to ask, one, were you aware of the camera? Two, did you believe that the camera was on, was recording? Three, did you believe that the camera was recording audio only? Did you believe that the camera was recording audio and visual? Why couldn't you ask those questions of each juror without getting into their deliberations? But, again, Your Honor, we had answers to those questions of whether or not it was recording. I'm asking what the jurors knew, which is what we're missing here. And would it have been problematic from a deliberation standpoint to ask those questions that I just asked you? Your Honor, our stance is that it's not necessary based on the cases that have been presented in the briefs. Now, that didn't answer my question, but thank you. And for that reason, we ask this court to affirm the district court's ruling. Thank you. Thank you, counsel. I think we've exhausted our argument time this morning. Very interesting case. We appreciate the arguments from both counsel. The case will be submitted. Counsel are excused. And the court will be in recess until 8.30.